1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                          AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 22-CR-187(1) RP
                              )
4   vs.                      ) Austin, Texas
                              )
5   STEVE RAY SHICKLES, JR.   ) June 16, 2023

6

7                     TRANSCRIPT OF SENTENCING
             BEFORE THE HONORABLE ROBERT L. PITMAN

8

9   APPEARANCES:

10  For the United States:    Mr. Matthew B. Devlin
                              Assistant U.S. Attorney
11                            903 San Jacinto Boulevard,
                              Suite 334
12                            Austin, Texas 78701

13

14  For the Defendant:        Mr. Horatio R. Aldredge
                              Assistant Federal Public Defender
15                            Lavaca Plaza
                              504 Lavaca Street, Suite 960
16                            Austin, Texas 78701

17

18

19  Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
20                            Austin, Texas 78701
                              (512)391-8792
21

22

23

24

25  Proceedings reported by computerized stenography,
    transcript produced by computer aided-transcription.

| | | |
|---|---|---|
| 09:59:00 | 1 | THE CLERK:  The Court calls: A-22-CR-187, <u>The</u> |
| 09:59:03 | 2 | <u>United States vs. Steve Ray Shickles, Jr.</u>, for sentencing. |
| 09:59:07 | 3 | MR. DEVLIN:  Morning, Judge. |
| 09:59:08 | 4 | Matthew Devlin for the United States. |
| 09:59:09 | 5 | THE COURT:  Mr. Devlin, good morning. |
| 09:59:11 | 6 | MR. DEVLIN:  Morning. |
| 09:59:11 | 7 | MR. ALDREDGE:  Horatio Aldredge for Mr. Shickles. |
| 09:59:14 | 8 | THE COURT:  Mr. Aldredge, good morning. |
| 09:59:15 | 9 | And you are Steve Ray Shickles, Jr.? |
| 09:59:17 | 10 | THE DEFENDANT:  Yes, sir. |
| 09:59:18 | 11 | THE COURT:  Good morning, sir. |
| 09:59:20 | 12 | Mr. Shickles, the purpose of this hearing today |
| 09:59:22 | 13 | is for me to impose a sentence in your case.  In a few |
| 09:59:24 | 14 | minutes, I'll give you the opportunity to say anything |
| 09:59:26 | 15 | you'd like to say before I sentence you.  You don't have |
| 09:59:30 | 16 | to speak.  You can let your lawyer speak for you, but I |
| 09:59:32 | 17 | will give you that opportunity. |
| 09:59:34 | 18 | First, let me check with you to make sure that |
| 09:59:36 | 19 | you believe you've had enough time with Mr. Aldredge |
| 09:59:38 | 20 | before today to prepare for this sentencing hearing. |
| 09:59:41 | 21 | THE DEFENDANT:  Yes, your Honor. |
| 09:59:42 | 22 | THE COURT:  During your conversations with Mr. |
| 09:59:44 | 23 | Aldredge, did he show you a copy of the presentence |
| 09:59:47 | 24 | investigation report that the probation office prepared in |
| 09:59:50 | 25 | your case? |

| | | |
|--|--|--|
| 09:59:50 | 1 | THE DEFENDANT:  Yes, your Honor. |
| 09:59:51 | 2 | THE COURT:  Did he talk to you about the federal |
| 09:59:54 | 3 | sentencing guidelines, what those are and what those -- |
| 09:59:56 | 4 | what the guidelines have recommended in your case? |
| 09:59:57 | 5 | THE DEFENDANT:  He did, your Honor. |
| 09:59:58 | 6 | THE COURT:  All right.  Mr. Aldredge, do you |
| 10:00:00 | 7 | believe you've had enough time with your client to prepare |
| 10:00:02 | 8 | for this sentencing hearing today? |
| 10:00:04 | 9 | MR. ALDREDGE:  Yes, your Honor. |
| 10:00:05 | 10 | THE COURT:  During your meetings with him, did |
| 10:00:06 | 11 | you review with him in detail the presentence |
| 10:00:09 | 12 | investigation report that was filed in his case? |
| 10:00:12 | 13 | MR. ALDREDGE:  Yes, your Honor. |
| 10:00:12 | 14 | THE COURT:  Did you talk to him about the |
| 10:00:13 | 15 | operation of the federal sentencing guidelines in his |
| 10:00:16 | 16 | case? |
| 10:00:17 | 17 | MR. ALDREDGE:  I did, your Honor. |
| 10:00:18 | 18 | THE COURT:  I note that you did have one |
| 10:00:20 | 19 | unresolved objection to the presentence investigation |
| 10:00:22 | 20 | report and I'd be glad to hear you on that now. |
| 10:00:24 | 21 | MR. ALDREDGE:  Your Honor, actually, I need to |
| 10:00:28 | 22 | place an objection as to the restitution amount. |
| 10:00:30 | 23 | Obviously we've had some litigation about that and I think |
| 10:00:35 | 24 | my position is clear about the relevancy of the documents |
| 10:00:39 | 25 | that I've been seeking which would be able to establish |

10:00:43    1    any additional amount, essentially the profit from the

10:00:49    2    sale of those -- that property would be credited against

10:00:55    3    the restitution amount.  So obviously I don't know what

10:00:58    4    that amount is, but the basis for establishing that

10:01:06    5    amount, I establish and I understand the Court's position.

10:01:09    6    I don't need to make any further argument about that.

10:01:11    7          So I would -- if the Court will allow me to make

10:01:15    8    that objection formally.

10:01:16    9          THE COURT:  Absolutely.

10:01:17   10          MR. ALDREDGE:  Okay.  And understanding it's

10:01:19   11    overruled.

10:01:20   12          THE COURT:  And there's a record, I believe.

10:01:22   13          MR. ALDREDGE:  That's right.

10:01:23   14          THE COURT:  And as to the sophisticated means,

10:01:28   15    your Honor, you know, the probation department says that

10:01:33   16    this is -- you know, this carried on for so long that it

10:01:35   17    was sophisticated but that just doesn't address the point.

10:01:39   18    The guidelines, of course, define sophisticated means,

10:01:46   19    especially complex or especially intricate.

10:01:51   20    Merriam-Webster defines sophisticated as developed to a

10:01:55   21    high degree of complexity.  And neither one of those

10:01:58   22    definitions is met by the conduct that Mr. Shickles

10:02:05   23    engaged in.

10:02:06   24          There are a couple of instances cited by the

10:02:08   25    government and established in the presentence report that

10:02:13  1  are purported to be the sophisticated means, one of which

10:02:17  2  is that he, Mr. Shickles, asked an employee to change a

10:02:21  3  script on an internal daily report, which in itself would

10:02:27  4  have amounted to about 30 seconds to 60 seconds of

10:02:31  5  programming, changing the code, A.  B, seems hardly

10:02:37  6  complex or deceptive to ask somebody to do that.

10:02:42  7          If he wanted to be truly deceptive, he would have

10:02:45  8  maybe gone in and would have been cable of doing it on his

10:02:47  9  own.  So to ask an employee openly to do this was that --

10:02:53  10  who could have established it at any point, if asked, is

10:02:58  11  not deceptive or duplicitous.  He actually asked this

10:03:04  12  person openly to do this.  And then, the second instance

10:03:07  13  is where he was able to receive directly to his account a

10:03:12  14  refund for property purchased and he sent a fake e-mail.

10:03:22  15          So again, it's deceptive and as I said in my

10:03:27  16  reply to the government's response to my objection, those

10:03:32  17  are the acts that really turn this into -- from a state

10:03:38  18  embezzlement case into a federal fraud case.  There has to

10:03:42  19  be some deception by definition in order to -- for a theft

10:03:47  20  crime to become a fraud crime.  But the question is, what

10:03:53  21  -- was that deception to the level that it's especially

10:03:57  22  complex and intricate, and I believe that the answer is no

10:04:02  23  in this case.

10:04:04  24          THE COURT:  Thank you.

10:04:05  25          MR. ALDREDGE:  That's all I have, your Honor.

10:04:06   1        THE COURT:  Mr. Devlin.

10:04:07   2        MR. DEVLIN:  Judge, I did file a written response

10:04:08   3   to his objection and I would adhere to that.  I really

10:04:12   4   don't have much to add to that.  But in summary, I think

10:04:14   5   the fact that there were the two methods cited by Mr.

10:04:20   6   Aldredge in not only committing the crimes that he did but

10:04:23   7   deceiving others and lulling them into not looking into it

10:04:28   8   any further distinguishes this case from the case that he

10:04:31   9   cited, the Valdez case, which involved basically simply

10:04:35   10   one person moving money from one account to another both

10:04:38   11   in his name.

10:04:39   12        There was no need for him in that case to deceive

10:04:42   13   others or to somehow take action to conceal things whereas

10:04:46   14   here, he did that in a couple of instances as described.

10:04:51   15   He had this daily e-mail that went out to the company and

10:04:54   16   to the interested persons where he did not reveal that.

10:04:59   17   They trusted him with that and that was, you know, by

10:05:03   18   itself the action of just simply asking a person to do

10:05:06   19   that, to change that e-mail is not really the focus here.

10:05:09   20   It obviously caused this e-mail to go out to others and to

10:05:13   21   lull them into thinking that everything was okay.

10:05:15   22        And then, again, creating an e-mail account in

10:05:17   23   the name of another trusted individual at the company who

10:05:21   24   -- the other company that gave the refund knew and, again,

10:05:26   25   had dealt with before, that was certainly another act that

| | |
|---|---|
| 10:05:31 | 1 |
| 10:05:34 | 2 |
| 10:05:38 | 3 |
| 10:05:41 | 4 |
| 10:05:42 | 5 |
| 10:05:45 | 6 |
| 10:05:48 | 7 |
| 10:05:51 | 8 |
| 10:05:58 | 9 |
| 10:06:02 | 10 |
| 10:06:06 | 11 |
| 10:06:10 | 12 |
| 10:06:13 | 13 |
| 10:06:14 | 14 |
| 10:06:16 | 15 |
| 10:06:21 | 16 |
| 10:06:23 | 17 |
| 10:06:25 | 18 |
| 10:06:27 | 19 |
| 10:06:27 | 20 |
| 10:06:28 | 21 |
| 10:06:29 | 22 |
| 10:06:31 | 23 |
| 10:06:35 | 24 |
| 10:06:38 | 25 |

made this more sophisticated.  We're not certainly arguing that this is the most sophisticated fraud ever, but it certainly meets the threshold of the definition under the guidelines for sophisticated means and we would ask that the Court retain that enhancement in the guidelines.

THE COURT:  Thank you.  I agree with the government's position that the defendant's conduct in this case meets both the letter and the spirit of the guideline.  The guidelines specifically defines behavior as hiding assets or transactions in the use of fictitious entities, and I think by any standard, the defendant's conduct meets that standard and so, I will overrule that objection.

Mr. Aldredge, do you have any other objections?

MR. ALDREDGE:  No, your Honor.  If the Court would be so kind to formally overrule my --

THE COURT:  Yes.  I just did.

MR. ALDREDGE:  Okay.  Thank you.  I have nothing further.

THE COURT:  Okay.  Any objection from the government?

MR. DEVLIN:  No objections, Judge.

THE COURT:  All right.  I will, then, as a consequence of overruling the defendant's objection, I will adopt the findings of the presentence investigation

10:06:40  1   report and make them a part of the record for the purposes

10:06:43  2   of this hearing.

10:06:43  3           Mr. Shickles, now I want to go over with you both

10:06:48  4   the statutory range of punishment that you face today for

10:06:52  5   committing wire fraud in violation of the federal law,

10:06:56  6   then we'll talk about what the sentencing guidelines are

10:06:58  7   recommending in your case.  The statute in this case

10:07:01  8   provides for the possibility of a sentence of

10:07:04  9   incarceration of up to 20 years, followed by a term of

10:07:07  10  supervised release of up to three years, or a term of

10:07:10  11  probation of between one and five years.

10:07:13  12          The statute provides for a fine of up to

10:07:17  13  $250,000, in addition to an amount of restitution that has

10:07:20  14  been determined in this case by the probation office to be

10:07:23  15  $1,657,639.93.  Finally, I will impose a one-time monetary

10:07:32  16  assessment under the Victims of Crimes Act of $100.

10:07:35  17          Do you understand what the statutory range of

10:07:38  18  punishment is in this case?

10:07:39  19          THE DEFENDANT:  Yes, your Honor.

10:07:40  20          THE COURT:  Now, the sentencing guidelines were

10:07:42  21  applied in this case.  The offense level was found to be a

10:07:45  22  level 24 and your Criminal History a Category I.  As a

10:07:49  23  result, the guidelines recommend that I sentence you to a

10:07:51  24  term of incarceration of between 51 and 63 months,

10:07:56  25  followed by a term of supervised release of between one

10:07:58  1    and three years.  The guidelines do not recommend

10:08:01  2    probation, but they do recommend a fine of between 20 and

10:08:05  3    $200,000, in addition to the restitution that I've

10:08:08  4    previously identified, and the $100 special assessment.

10:08:12  5            Do you understand what the federal sentencing

10:08:14  6    guidelines are recommending in your case?

10:08:16  7            THE DEFENDANT:  I do, your Honor.

10:08:16  8            THE COURT:  Now, finally, there is a plea

10:08:19  9    agreement in this case that recommends to the Court,

10:08:23  10   however, it's not binding on the Court, that I sentence

10:08:25  11   you to a term of imprisonment at the low end of the

10:08:29  12   guideline range or period equivalent to the period that

10:08:33  13   you have already served, which I'm not aware of what that

10:08:36  14   is.

10:08:37  15           MR. ALDREDGE:  Maybe a day or two.

10:08:38  16           THE COURT:  Okay.  So it would be the low end of

10:08:40  17   the guidelines then, effectively.

10:08:42  18           MR. ALDREDGE:  Yes.

10:08:42  19           THE COURT:  And the plea agreement is -- only

10:08:46  20   contemplates some period of supervised release and a fine,

10:08:51  21   but does not address the restitution and special

10:08:54  22   assessment.

10:08:54  23           Do you understand what the plea agreement that

10:08:56  24   you have with the government is recommending?

10:08:58  25           THE DEFENDANT:  I do, your Honor.

| | | |
|---|---|---|
| 10:08:59 | 1 | THE COURT:  And do you understand that that |
| 10:09:00 | 2 | recommendation is not binding on me? |
| 10:09:02 | 3 | THE DEFENDANT:  I do, your Honor. |
| 10:09:03 | 4 | THE COURT:  Okay.  Very good.  All right. |
| 10:09:05 | 5 | Mr. Shickles, Mr. Aldredge, would you like to go |
| 10:09:10 | 6 | first or would you like your client to address?  Okay. |
| 10:09:13 | 7 | Mr. Shickles, I'd be happy to hear anything you would like |
| 10:09:16 | 8 | to say now before I impose your sentence. |
| 10:09:17 | 9 | THE DEFENDANT:  Thank you, your Honor.  If you |
| 10:09:18 | 10 | don't mind, I'm going to read from my notes. |
| 10:09:20 | 11 | I'm very sorry I broke the law while working at |
| 10:09:24 | 12 | Simple Helix when I made unauthorized money transfers from |
| 10:09:27 | 13 | my personal accounts.  I abused my position of trust and |
| 10:09:29 | 14 | harmed my employer.  I am ashamed of myself for making |
| 10:09:33 | 15 | such terrible choices.  To the owners and employees at |
| 10:09:36 | 16 | Simple Helix, I apologize.  As a proud United States |
| 10:09:39 | 17 | citizen, I understand it's my duty to obey the law to the |
| 10:09:42 | 18 | owners of Simple Helix were counting on me to act |
| 10:09:45 | 19 | honorably and I failed them.  I will do whatever it takes |
| 10:09:48 | 20 | to make amends and pay my full restitution. |
| 10:09:51 | 21 | My family, my community relied on me to make good |
| 10:09:54 | 22 | judgment and make wise decisions.  Getting sentenced today |
| 10:09:58 | 23 | proves that I let them down.  The consequences of my |
| 10:10:00 | 24 | illegal actions will follow me and my family for the rest |
| 10:10:02 | 25 | of our lives.  I wish I could undo the past, but I can't |

10:10:05  1  and I'm deeply sorry.  I will never forget the lessons

10:10:08  2  I've learned during this legal process and am grateful

10:10:11  3  that this country offers a second chance to those who earn

10:10:14  4  it.

10:10:15  5          I'm determined to prove worthy of that second

10:10:17  6  chance.  In the years ahead, I want to use my story to

10:10:20  7  help other people make better choices that I did in this

10:10:22  8  case.  Your Honor, I am deeply committed to learning from

10:10:26  9  this experience and making amends for the harm I have

10:10:29  10  caused.  I am determined to become a better person not

10:10:32  11  only for myself but also my family, friends and community.

10:10:36  12  I understand that I have a long road ahead and I'm

10:10:39  13  prepared to face it with humility, determination, and a

10:10:42  14  renewed sense of purpose.

10:10:44  15          To close, your Honor, I am very sorry that I've

10:10:46  16  betrayed the trust of my colleagues and the owners of

10:10:48  17  Simple Helix.  I take full responsibility for my criminal

10:10:51  18  conduct.  I assure even this court, I will never return as

10:10:56  19  a defendant again.  Thank you, your Honor.

10:10:58  20          THE COURT:  Thank you.

10:10:59  21          MR. ALDREDGE:  Your Honor, Mr. Shickles' wife

10:11:02  22  Ronda and two friends would like to speak, if they may.

10:11:08  23          THE COURT:  Sure.

10:11:09  24          MR. ALDREDGE:  Your Honor, this is a case that's

10:11:11  25  very different than the typical kind of Ponzi-scheme fraud

10:11:16  1  case that we see where generally what we see is that

10:11:19  2  somebody just decides who -- somebody who really doesn't

10:11:21  3  have the ability to work and apply themselves decides that

10:11:25  4  they deserve some amount of money and so, they begin to

10:11:29  5  steal it by devising a Ponzi scheme, again, typically and

10:11:37  6  just out and out stealing people's money and he did that,

10:11:41  7  too, but he was actually productive.  He's hard working.

10:11:44  8  He has a life -- life's record of working hard, making his

10:11:50  9  way on his own.

10:11:54  10        And this was essentially -- it wasn't a

10:11:57  11  predesigned scheme.  It was a crime of opportunity and I

10:11:59  12  know that that ultimately doesn't lessen the amount he

10:12:02  13  stole, which is obviously enormous, and it doesn't lessen

10:12:09  14  the gravity of the crime, but it does mean he is

10:12:16  15  different.  He is somebody who is truly, genuinely

10:12:19  16  remorseful.  He's somebody that can and will continue to

10:12:24  17  be hard working and productive.  He does not feel sorry

10:12:27  18  for himself.  He doesn't feel wrong, aggrieved by the

10:12:31  19  prosecution, his prosecution in this case.  He's somebody

10:12:36  20  who's actually going to be able to repay a significant

10:12:39  21  amount of his restitution debt.  Hopefully all.

10:12:42  22        THE COURT:  Can you address that piece right now?

10:12:46  23  I show that the last restitution payment was over a year

10:12:49  24  ago; is that right?

10:12:50  25        MR. ALDREDGE:  That is true, your Honor.  He has

| | | |
|---|---|---|
| 10:12:53 | 1 | been gainfully employed.  He's provided his pay stubs -- |
| 10:12:55 | 2 | biweekly pay stubs to the Pretrial Services Office.  Right |
| 10:13:01 | 3 | now, he's got -- he's had significant medical bills from |
| 10:13:06 | 4 | his wife.  His wife suffered a stroke about a year ago. |
| 10:13:10 | 5 | He's been taking care of the family entirely.  He's not |
| 10:13:17 | 6 | banking -- he hasn't had any money to save.  He's |
| 10:13:23 | 7 | volunteered -- he spent time volunteering.  He's had extra |
| 10:13:28 | 8 | time to do that beyond his full-time employment but that's |
| 10:13:34 | 9 | essentially -- any money he has has been tied up in |
| 10:13:38 | 10 | ongoing obligations at home, familial obligations.  The |
| 10:13:47 | 11 | last payment was, I think as you said, a year ago. |
| 10:13:51 | 12 | Your Honor, that's -- in the end, the guideline |
| 10:13:56 | 13 | range is adequate to meet all of the sentencing goals of |
| 10:14:03 | 14 | 3553(a).  And we would ask the Court to accept the |
| 10:14:10 | 15 | recommendation of the parties for a sentence of no greater |
| 10:14:14 | 16 | than the low end of the guideline range.  It is -- it will |
| 10:14:19 | 17 | be a long time that he will be away from his family and it |
| 10:14:22 | 18 | is, again, sufficient to meet the sentencing goals of |
| 10:14:28 | 19 | deterrence and punishment and promoting respect for the |
| 10:14:35 | 20 | law.  And for all those reasons, Judge, we'd ask that the |
| 10:14:37 | 21 | Court impose a sentence of no greater than 51 months. |
| 10:14:40 | 22 | THE COURT:  Thank you very much.  You can have a |
| 10:14:42 | 23 | seat.  And I'd be happy to hear from anyone who would like |
| 10:14:44 | 24 | to make a statement on Mr. Shickles' behalf. |
| 10:15:09 | 25 | MS. SHICKLES:  Your Honor, thank you for the |

| | | |
|---|---|---|
| 10:15:10 | 1 | opportunity to speak today.  I apologize.  I will have to |
| 10:15:15 | 2 | read my notes. |
| 10:15:16 | 3 | THE COURT:  Sure. |
| 10:15:17 | 4 | MS. SHICKLES:  As a stroke survivor, I also have |
| 10:15:20 | 5 | aphasia so I just ask for your patience. |
| 10:15:22 | 6 | THE COURT:  Take your time.  Can you state your |
| 10:15:23 | 7 | name for the record? |
| 10:15:25 | 8 | MS. SHICKLES:  Ronda Shickles. |
| 10:15:26 | 9 | THE COURT:  Thank you. |
| 10:15:32 | 10 | MS. SHICKLES:  I was shocked and overwhelmed when |
| 10:15:34 | 11 | I learned of the charges against Steve.  Steve and I have |
| 10:15:40 | 12 | had many long conversations about his bad choices in this |
| 10:15:48 | 13 | case.  I love my husband for accepting the consequences of |
| 10:15:54 | 14 | his action with humility.  When I met Steve 18 years ago, |
| 10:16:03 | 15 | I immediately noticed his impeccable manners, his hard |
| 10:16:11 | 16 | work ethic, and his gentle soul.  Steve is the very best |
| 10:16:19 | 17 | dad to our girls.  He is a volunteer at our church and has |
| 10:16:26 | 18 | been a youth sports coach, as well. |
| 10:16:38 | 19 | If a person is in need, Steve will be there to |
| 10:16:42 | 20 | help.  After my uncle shattered his ankle, Steve loaned |
| 10:16:48 | 21 | him his car and then, also helped my uncle move into a new |
| 10:16:54 | 22 | home.  On June 19th of 2020, I suffered a rare type of |
| 10:17:03 | 23 | stroke when a blood clot caused hemorrhage in my brain. |
| 10:17:12 | 24 | Since then, Steve has done everything possible to help and |
| 10:17:17 | 25 | support me.  He takes responsibility for all household and |

10:17:27  1  parenting duties.  He manages my medications, my many

10:17:32  2  doctors appointments, and my complicated therapy

10:17:40  3  schedules.  Thanks to Steve's dedication and love, I have

10:17:42  4  made remarkable progress.

10:17:47  5          Your Honor, this legal process has been a time of

10:17:53  6  reckoning and reflection for Steve.  My husband does not

10:18:02  7  sugarcoat the seriousness of his case.  He understands the

10:18:11  8  importance of accepting responsibility and making amends.

10:18:23  9  Steve has worked with a counselor to help him come to

10:18:28  10  terms with his actions and face serving time in prison for

10:18:34  11  his choices.  I hope this court will consider my husband's

10:18:43  12  long record of hard work and service to others.  Steve is

10:18:50  13  a kindhearted man with unlimited potential for a

10:18:58  14  productive, purposeful future.  I love my husband very

10:19:10  15  much and hope this court will show mercy today.

10:19:13  16          THE COURT:  Thank you, ma'am.

10:19:16  17          MS. SHICKLES:  Thank you.

10:19:16  18          THE COURT:  Anyone else?

10:19:31  19          MS. ESPARZA:  Sorry.

10:19:33  20          THE COURT:  Your name, please?

10:19:35  21          MS. ESPARZA:  My name is Leslie Esparza and thank

10:19:40  22  you for the opportunity to speak.  Sorry, I didn't mean

10:19:43  23  to --

10:19:45  24          THE COURT:  Take your time.

10:19:48  25          MS. ESPARZA:  I've known the Shickles for four

```
10:19:51   1   years.  We met because our children go to school together
10:19:55   2   and Ronda and I bonded over the fact that we both had a
10:20:00   3   daughter named XXXXX.  And when I met them, just from the
10:20:07   4   minute that I met Ronda, I knew that she was my people.
10:20:11   5   We live seven houses apart and our kids, you know, have a
10:20:18   6   lot of school activities together, attend church
10:20:20   7   activities together.  So we've spent a lot of time
10:20:22   8   together.  I've been in their home.  They've been in my
10:20:26   9   home.  We've taken each other's kids places.  We've done
10:20:30  10   errands together, date nights together.  We live a life
10:20:35  11   together and they have become like my extended family.
10:20:37  12          Steve and their XXXXX and XXXXXXXX is like a
10:20:42  13   family to me.  They are family to me.  And in that time --
10:20:48  14   sorry.  I've really -- I guess I'm just nervous because I
10:20:58  15   really want to share.  I just shed some light on who Steve
10:21:02  16   is as a husband and as a friend and as a father and --
10:21:11  17   okay.  I'll share just -- I know I need to be concise and
10:21:15  18   that's not my strength even in a normal situation.
10:21:18  19          So when we first met, Steve and Ronda started
10:21:22  20   coming to church with us and Steve is such a servant.
10:21:27  21   This was during the time of COVID and there was -- you
10:21:30  22   know, there was unusual meeting situations and we would
10:21:33  23   have to move our entire church out to the parking lot so
10:21:38  24   that people could drive up in their cars and listen or sit
10:21:44  25   in a car in the parking lot and listen to the service that
```

| | |
|---|---|
| 10:21:48 | 1 |

way if they wanted to.  And Steve would spend his entire

Saturday moving the entire sound system outside to the

parking lot.  I'd get there on Sundays at 8:00 a.m., which

I felt was really early because the service started at

10:00.  I thought, you know -- and Steve had already been

there for an hour and a half setting up sound.

A year ago -- a Father's Day a year ago, Ronda

had, as you know, she just mentioned, a massive stroke and

Steve never left her side.  The hospital's seven minutes

from our home so I would try to go and say, Steve, take

five minutes, like go outside, get some sun, and he did

not want to leave her side for a minute because he wanted

her to know when she woke up or if she needed him that he

was there.  And he would sit there on his computer and

educate himself everything about her condition, how he

could advocate for her.

He is a caregiver by nature.  He's a servant.

He's extremely kind.  And his daughter XXXXX and XXXXXXXX

need him.  He's the type of dad every time I'm in their

home, he's not in some man cave watching a movie like

trying to get some time to himself.  He's in the kitchen.

He's in the living room with his girls, he spends time

with them.  XXXXX is just like Steve and XXXXXXXX is just

like Ronda and both of those girls need both of their

parents.  XXXXX needs Steve to be able to let her know

10:23:26   1   how, you know, important she is and that she's loved

10:23:29   2   because high school's hard.  XXXXXXXX needs Steve to

10:23:33   3   protect her and shoo the boys away like he does.  He does

10:23:38   4   a great job.  He's an incredible dad and he's an

10:23:42   5   incredible husband to Ronda the way he's taking care of

10:23:45   6   her.

10:23:46   7             I know that I'm rambling and I'm sorry and I know

10:23:48   8   that there's a lot here that I don't understand.  You read

10:23:52   9   the guidelines and the one thing I do understand is the

10:23:57   10  importance of family and the importance of having a dad at

10:24:02   11  home.  And so, that would just be if I can share that

10:24:10   12  thought and ask you to consider Ronda obviously needs him

10:24:15   13  for practical reasons, but XXXXX and XXXXXXXX, they need

10:24:21   14  their dad at home.

10:24:23   15            THE COURT:  Ma'am, may I ask you what Mr.

10:24:25   16  Shickles' told you as to why he's here today?

10:24:29   17            MS. ESPARZA:  Yes.  Actually, they've been very

10:24:33   18  clear and very up front and very -- they're very genuine,

10:24:42   19  honest.  Steve has said to Ronda, I will spend the rest of

10:24:46   20  my life making this up to you.

10:24:48   21            THE COURT:  Do you know how much money he stole?

10:24:50   22  Did he tell?

10:24:51   23            MS. ESPARZA:  I do.

10:24:51   24            THE COURT:  How much?

10:24:54   25            MR. ESPARZA:  Three million; is that not correct?

| | | |
|---|---|---|
| 10:24:55 | 1 | THE COURT:  Have you had an opportunity to read |
| 10:24:57 | 2 | the statement that the victim in this case wrote about the |
| 10:25:00 | 3 | impact on their lives? |
| 10:25:02 | 4 | MS. ESPARZA:  You know, it's interesting that you |
| 10:25:03 | 5 | say that because I had to make that decision when I met |
| 10:25:07 | 6 | Steve and when we started building relationships and I do |
| 10:25:13 | 7 | understand what you're saying. |
| 10:25:15 | 8 | THE COURT:  No.  I'm just asking whether you've |
| 10:25:17 | 9 | read it. |
| 10:25:18 | 10 | MS. ESPARZA:  I do.  I do understand that -- I |
| 10:25:23 | 11 | understand what you're asking but I did have to make that |
| 10:25:25 | 12 | decision.  When I met Steve and Ronda, if I'm going to |
| 10:25:30 | 13 | Google him and read things about him online or if I'm |
| 10:25:33 | 14 | going to make my decision about him based on the man that |
| 10:25:39 | 15 | I spend time with and whose house I'm in and I know -- I |
| 10:25:45 | 16 | knew -- I wanted him to know that I know who he is.  And I |
| 10:25:50 | 17 | also know our actions do have consequences and they hurt |
| 10:25:59 | 18 | people.  And every conversation I've had with Steve, |
| 10:26:05 | 19 | there's never been a deflection of responsibility.  If |
| 10:26:12 | 20 | anything, it's the opposite.  He has the weight of the |
| 10:26:15 | 21 | world on his shoulders.  He's extremely humble and he's |
| 10:26:24 | 22 | the kind of guy that will beat himself up about it for the |
| 10:26:27 | 23 | rest of his life, no matter what you decide here today. |
| 10:26:31 | 24 | He'll carry the weight of it on his shoulders for the rest |
| 10:26:34 | 25 | of his life.  And for me and my role in their life, my |

10:26:37  1  role was not to add to that.  My role is to love them, no

10:26:43  2  matter what.

10:26:45  3          And I do hope that the family that he's --

10:26:53  4  affected by his actions, I hope that they have people

10:26:55  5  supporting them and helping them, as well.  But my role

10:26:57  6  has been to support them and love them.  And so yes, to

10:27:04  7  answer your question.  Honestly, Ronda is the type of

10:27:11  8  person, she'll just tell ya.  She doesn't -- she needs a

10:27:15  9  girlfriend to talk to, too.  But they've never tried to

10:27:21  10 pretend like this was anything other than -- they've never

10:27:28  11 tried to deflect responsibility.  I'm sorry for my --

10:27:32  12          THE COURT:  Not at all.  It's very helpful.

10:27:34  13 Thank you.

10:27:36  14          MS. ESPARZA:  Thank you.

10:27:36  15          THE COURT:  Thank you.

10:27:47  16          Good morning.  Your name, please?

10:27:49  17          MS. HYATT:  I'm Stephanie Hyatt.  Really, Judge,

10:27:53  18 I just want you to have an idea, as Leslie, of who Steve

10:27:58  19 is and who we see him as.  I actually met Steve 18 years

10:28:01  20 ago, the same night that Ronda met him.  Ronda and I were

10:28:05  21 involved with the children's play at Fantasy Playhouse,

10:28:08  22 Huntsville, Alabama, which I came from yesterday to be

10:28:10  23 here, and Steve and she had met on online and he was

10:28:17  24 coming to meet her for the first time.  So I sat with

10:28:20  25 Ronda backstage before I went on stage.  She was our

10:28:22  1   producer and we kind of peeked through to see him sitting

10:28:25  2   in the crowd to see who he was.  We knew where his seat

10:28:28  3   was.  And so, I was there from the very beginning of their

10:28:31  4   courtship and their relationship.  I was at their wedding.

10:28:34  5   I was there for the birth of both of their children and

10:28:37  6   I've been there through that 18 years.

10:28:39  7         My children call them Uncle Steve and Aunt Ronda.

10:28:44  8   They were there for the raising of my children.  Steve is

10:28:49  9   many things.  I am well aware of what he has pled guilty

10:28:53  10  to, what he has done, but I see him as Uncle Steve.  He is

10:28:59  11  the man who took the best pictures of my son when he was

10:29:01  12  four years old.  He is the man that, you know, hung out in

10:29:04  13  my backyard grilling.  He has been an amazing father to

10:29:09  14  his children, an amazing husband to my best friend.  He

10:29:13  15  has been an amazing friend to my husband.  He's -- when

10:29:18  16  Ronda and I were involved for years and years in

10:29:20  17  Huntsville with children's theater, Ronda taught, dealt

10:29:25  18  with, you know, teaching children's theater classes, and

10:29:28  19  Steve could always be counted on to show up.  And they

10:29:32  20  were talking about the sound system, he could get that

10:29:34  21  stuff going.  He could fix the sound, he could get the

10:29:36  22  lights going, all of this stuff.  He was just a rock.  He

10:29:39  23  was a rock for everyone to call on to make things right,

10:29:43  24  to make things work.  And the value of that in this

10:29:48  25  situation is, he will continue to be that rock.  He is

10:29:50  1    going to continue to make things right.  That is simply

10:29:52  2    who he is.

10:29:55  3         Ronda did have a stroke a year ago.  You've heard

10:29:57  4    that.  You've seen her.  She's doing remarkably better.

10:30:00  5    The day it happened, she would have died if Steve had not

10:30:03  6    realized that something was going on.  She kept saying, I

10:30:06  7    have a migraine and then, she would start speaking and,

10:30:09  8    you know, just weird gibberish and he immediately took her

10:30:13  9    to the hospital and luckily for them, the hospital near

10:30:15  10   them had this great stroke system and immediately got

10:30:19  11   involved.

10:30:20  12        Since then, I flew out here a couple of weeks

10:30:23  13   after it happened to try to be here as support.  But other

10:30:26  14   than to drive her around, he had everything under control.

10:30:30  15   He had meals under control.  He had the girls' schedules

10:30:33  16   under control.  He had all of her doctors' appointments

10:30:35  17   and therapy schedule under control.  There was a lot to

10:30:39  18   recovery from a stroke and he has basically made it his

10:30:42  19   job over this past year to see her recover, and what I see

10:30:45  20   in that and what I want you to see in that is, this

10:30:50  21   experience -- he's worked with a counselor through this

10:30:55  22   experience.  This experience of realizing how badly he

10:30:58  23   screwed up, how badly he messed up has turned him even

10:31:01  24   into a stronger man of I am going to do what's right for

10:31:05  25   my family.  I am going to do what's right and what I need

| | | |
|---|---|---|
| 10:31:07 | 1 | to do.  And I think that's who you have in front of you |
| 10:31:10 | 2 | today is someone who is committed to doing all of those |
| 10:31:13 | 3 | right things.  That is what has been expressed to me. |
| 10:31:16 | 4 | THE COURT:  Thank you very much. |
| 10:31:18 | 5 | MS. HYATT:  Thank you. |
| 10:31:21 | 6 | THE COURT:  Anyone else? |
| 10:31:38 | 7 | MR. BARNES:  Hello, your Honor.  My name is |
| 10:31:39 | 8 | Steven Barnes.  So I'm here to represent not current |
| 10:31:44 | 9 | Simple Helix but past Simple Helix.  Steve worked at |
| 10:31:48 | 10 | Simple Helix for over half a decade and in that time when |
| 10:31:50 | 11 | I first moved here and when I first moved to Huntsville, I |
| 10:31:54 | 12 | got a job at Simple Helix, immediately, I fell in love |
| 10:31:56 | 13 | with working with Steve.  He was a great guy, technology |
| 10:32:00 | 14 | guy, could talk about all sorts of things. |
| 10:32:03 | 15 | My role in that company was, I was a coder.  I |
| 10:32:07 | 16 | developed code integrations, APIs for the internal product |
| 10:32:12 | 17 | that we were selling.  My job was to be a part of, to |
| 10:32:18 | 18 | understand how the business was going, how things were |
| 10:32:23 | 19 | run.  That was my job.  In working with Steve, I knew |
| 10:32:29 | 20 | immediately that I liked him.  Like everyone else has |
| 10:32:32 | 21 | said, he's a great guy.  Understood -- he was a swell guy. |
| 10:32:38 | 22 | Our families hung out together.  Our families hung out |
| 10:32:41 | 23 | with their families.  We went on, you know, his boat.  We |
| 10:32:45 | 24 | went on jet skis.  If the -- so we knew each other very |
| 10:32:52 | 25 | well. |

| | | |
|---|---|---|
| 10:32:54 | 1 | On the other side, there was work Steve.  Work |
| 10:32:57 | 2 | Steve was the guy that I was helping to build the company |
| 10:33:01 | 3 | that we were doing.  I was there to make sure that he knew |
| 10:33:06 | 4 | that I was going to help him.  Whether it was going to a |
| 10:33:08 | 5 | conference with him and making sure that he had water, or |
| 10:33:11 | 6 | I held his jacket, or I was there to sell the product that |
| 10:33:15 | 7 | we were selling.  Steve -- I was making sure that the |
| 10:33:19 | 8 | company that we were running was being successful. |

On the other side, there was work Steve.  Work Steve was the guy that I was helping to build the company that we were doing.  I was there to make sure that he knew that I was going to help him.  Whether it was going to a conference with him and making sure that he had water, or I held his jacket, or I was there to sell the product that we were selling.  Steve -- I was making sure that the company that we were running was being successful.

On the other side -- so it was always told to us that Simple Helix was owned by Steve Shickles.  He owned a hundred percent of the company.  The other side was that we had another person, another investor named Jada Leo. Jada was a minor investor.  Jada didn't do any day-to-day operations.  They ran it as a manager manager, but at the end of the day, this was Steve's company, he owned majority of it, if not the whole thing.

So we were told if Jada had come into the office, not to talk to Jada.  Again, he's the investor, he doesn't know what he's doing, don't talk to Jada.  Don't talk to him at all.  That's kind of weird, but guy owns the company and he's my boss, I'm going to do that.  So for years and years, we absolutely held that party line.  We didn't talk to Jada.  We didn't talk to any accountants that came in.  That's just what we did.  So fast-forward a little bit, Simple Helix wants to grow.  Simple Helix

10:34:31  1  wants to make a data center.  In order to make a data

10:34:33  2  center, you need to have people who are going to give you

10:34:34  3  money.  You need to talk to banks.  Banks need P&L

10:34:38  4  statements.

10:34:38  5        So there was a day that Steve came into my office

10:34:41  6  and he said, hey, Steven, can you make me a report that

10:34:44  7  would just say how much money we have coming in, how much

10:34:48  8  money we have going out, and specify how it's actually

10:34:51  9  done, whether it's credit cards, checks, PayPal?  Simple

10:34:57  10  fix.  I knew how to do that, wrote that report, couple of

10:35:00  11  hours.  The next day, I ran it at 8:00 in the morning,

10:35:03  12  done.

10:35:05  13        Few days go by, I see he pops his head into my

10:35:08  14  office and says, hey, Steven, can you do me a favor?  Can

10:35:12  15  you take that PayPal part out of the report?  You see, we

10:35:18  16  do PayPal differently now and we account for it

10:35:21  17  differently in the company's accounts.  Okay.  And to his

10:35:27  18  attorney's point, it was a very easy fix to do.  It was my

10:35:30  19  job.  I wrote the report, easy fix, my boss told me to do

10:35:33  20  that.  Because Steve had always been kind of fickle on

10:35:36  21  certain things.  All I did was disable that part of the

10:35:39  22  report.  It didn't run.  It was still in there and I made

10:35:43  23  a comment, we do PayPal differently now, because I figured

10:35:46  24  in a week, he'd probably want it back in.  They fix

10:35:48  25  something on PayPal's side, end of story.

10:35:51   1        Flash forward a little bit, Simple Helix has a
10:35:56   2   data center, now we're doing great, but we still have
10:35:58   3   money issues.  There's a problem where Steve does -- Steve
10:36:01   4   came in one day and said we couldn't make payroll and was
10:36:04   5   going to have to write a personal check for $50,000 to
10:36:07   6   cover that payroll.  We were having money troubles.  Nice
10:36:12   7   data center, customers, where's the money going?
10:36:13   8        So we arranged a meeting with Jada.  Again, we're
10:36:19   9   all told that Jada's a minor investor in the company.  And
10:36:23  10   so, we have a meeting and Jada stands up in front of the
10:36:27  11   entire company and everyone lobs questions at Jada:  Why
10:36:32  12   aren't you investing more money?  Why aren't you asking
10:36:33  13   Steve for all these receipts?  Why are you doing all these
10:36:36  14   things?  It's his company.  And Jada stood up and said, I
10:36:40  15   don't know what you're talking about.  This is my company,
10:36:43  16   I own it.  Steve owns one percent of the company.  I am
10:36:48  17   here to say that all these things you're asking me, I've
10:36:53  18   never heard before or I don't know anything about these
10:36:55  19   things that y'all are having issues with.
10:36:59  20        So at the end of the meeting, I went up to Jada
10:37:01  21   and told him that I was not on team Shickles or team Leo,
10:37:06  22   I was on team Simple Helix, the company that's paying my
10:37:09  23   mortgage.  I'm here to make sure that I find out what's
10:37:11  24   going on.  And at the time, I was the security operations
10:37:15  25   center manager, so I had an elevated role in the company.

| | | |
|---|---|---|
| 10:37:20 | 1 | I was a trusted individual and I told Jada, I'm going to |
| 10:37:23 | 2 | find out what's going on. |
| 10:37:25 | 3 | And that next day, I pulled back data from all of |
| 10:37:28 | 4 | the PayPal transactions over the course of the last 10 |
| 10:37:33 | 5 | years or so since beginning of the PayPal account.  I |
| 10:37:38 | 6 | pulled them back and I saw obvious business transactions. |
| 10:37:42 | 7 | There was the Amazon here and there.  But in that, I also |
| 10:37:46 | 8 | saw transfers to his personal account.  I saw the Disney |
| 10:37:51 | 9 | Vacation Club.  I saw the multiple Amazon -- the car |
| 10:37:59 | 10 | parts, the obvious transactions that were not |
| 10:38:03 | 11 | business-related.  A total of what we've said was about |
| 10:38:07 | 12 | two million or so in funds that were in that account and |
| 10:38:13 | 13 | you could classify a lot of them as non-Simple Helix |
| 10:38:17 | 14 | purchases. |
| 10:38:17 | 15 | That's when we knew we had a problem.  I talked |
| 10:38:25 | 16 | to the people that knew Steve the best.  I talked to his |
| 10:38:28 | 17 | friends.  You see, again, I was friends with Steve.  We |
| 10:38:32 | 18 | had -- he had hired friends, too, Craig and Jennifer and |
| 10:38:36 | 19 | all these people who we were friends, and I asked them all |
| 10:38:40 | 20 | quickly, how did Steve make his money?  We all had |
| 10:38:43 | 21 | different ideas.  Inheritance, good stock purchases, what |
| 10:38:49 | 22 | have you.  Well, inheritance and good stock purchases get |
| 10:38:52 | 23 | you pretty far in life maybe, but it doesn't account for |
| 10:38:57 | 24 | the millions of dollars worth of cars I saw go through |
| 10:39:01 | 25 | Simple Helix as a personal purchase on Steve.  It didn't |

10:39:04  1  account for the hundreds of thousands of dollars of camera

10:39:08  2  gear that just sat on the table for months not being used.

10:39:13  3       Steve Shickles was very flashy with his money.

10:39:16  4  He was very flashy with showing people that he had more

10:39:19  5  money than you.  They went to the nicest schools and --

10:39:23  6  his kids went to the nicest schools, they were in all the

10:39:26  7  activities.  They had means and it was all ill-gotten at

10:39:31  8  the end of the day.

10:39:32  9       To the point of the people who spoke in front of

10:39:35  10  you already, yeah, Steve and I were friends.  I would have

10:39:39  11  taken a bullet for that man.  And at the end of the day,

10:39:43  12  I'm glad I didn't completely put all my faith in him

10:39:47  13  because after I figured out the lying person that he was

10:39:52  14  and the fact that he wasn't truthful about his other

10:39:55  15  families that he has.  He wasn't truthful about all of the

10:39:59  16  other issues that we found after we started looking.

10:40:03  17  After that, I realized he was a compulsive liar and I'm

10:40:08  18  glad I didn't trust him a hundred percent.

10:40:12  19       So all I have to say.  Thank you for your time,

10:40:14  20  sir.

10:40:14  21       THE COURT:  Thank you, sir.  Anyone else?  Yes,

10:40:20  22  sir.  Good morning, sir.  Your name?

10:40:31  23       MR. LEO:  My name is Jada Leo.  Thank you, your

10:40:38  24  Honor, for a chance to speak.  You're the hand of justice

10:40:42  25  today.  I was the primary owner of Simple Helix and I'm

10:40:49  1   glad to be standing here today.  577 days ago, I had a

10:40:54  2   massive heart attack and I never thought I would see the

10:40:57  3   day when we'd finally have justice and I'm glad to see I'm

10:41:02  4   here to see justice done.  Steve is a master manipulator,

10:41:10  5   I can tell you.  There's no doubt about it.

10:41:15  6         Regarding the funds that he's taken, the actual

10:41:17  7   calculation was about $19 million.  The settlement that he

10:41:21  8   signed was for $13 million to pay back to the company.

10:41:27  9   And his wife also signed a settlement agreement to pay

10:41:30 10   back $6 million to the company.  Ultimately, the

10:41:35 11   restitution amount is about 1.6 that has been resolved

10:41:38 12   here with the Department of Justice.  Do not believe the

10:41:45 13   words he's saying about remorse.  He is calculating, he is

10:41:52 14   ultimately the best manipulator I've ever run into.

10:41:55 15         I've spent all my life working hard to make a

10:41:58 16   living I have and then, to provide the funds to support

10:42:01 17   the company which I believed in and I believed in him.

10:42:06 18   And all these people who have come here to speak as his

10:42:08 19   friends, I can assure you there are many friends in

10:42:11 20   Huntsville that they played exactly the same way and, in

10:42:15 21   some cases, borrowed money from them and then walked away

10:42:18 22   with their money.

10:42:21 23         The truth is, the man is a criminal.  He will not

10:42:26 24   have remorse.  He's, you know, supposedly a great man and

10:42:31 25   a good man, but he's left two children in Alaska.  He's

| | | |
|---|---|---|
| 10:42:34 | 1 | abandoned them.  He's lived a life of taking advantage of |
| 10:42:39 | 2 | anyone he possibly can.  And, you know, I believe in my |
| 10:42:43 | 3 | heart that it's not only himself but, also, Ronda who's |
| 10:42:47 | 4 | well aware of all these matters.  I've seen papers signed |
| 10:42:51 | 5 | with her that, you know, she was an employee of Simple |
| 10:42:55 | 6 | Helix where she signed paperwork making $100,000 a year, |
| 10:42:59 | 7 | simply never happened.  Once again, false and manipulation |
| 10:43:03 | 8 | and I believe that, you know, truth needs to be -- or |
| 10:43:09 | 9 | justice needs to be done today.  And, you know, I urge you |
| 10:43:12 | 10 | to consider going beyond the sentencing limits, your |
| 10:43:17 | 11 | Honor. |
| 10:43:17 | 12 | This is a man who will continue to conduct crimes |
| 10:43:20 | 13 | and he will do all he can to do that.  He will manipulate |
| 10:43:25 | 14 | and he's a very smart guy.  I will give him this.  He's |
| 10:43:30 | 15 | very smart but highly manipulative.  He's a criminal and |
| 10:43:33 | 16 | justice needs to be served.  And today, your Honor, I hope |
| 10:43:36 | 17 | justice will be delivered.  Thank you. |
| 10:43:38 | 18 | THE COURT:  Thank you, sir.  Anyone else?  All |
| 10:43:44 | 19 | right. |
| 10:43:45 | 20 | Mr. Aldredge.  Anything further, Mr. Aldredge? |
| 10:43:52 | 21 | MR. ALDREDGE:  No, your Honor. |
| 10:43:53 | 22 | THE COURT:  Mr. Devlin? |
| 10:43:54 | 23 | MR. DEVLIN:  Well, Judge, I'm not sure I can add |
| 10:43:56 | 24 | much more than Mr. Leo and Mr. Barnes certainly did.  I |
| 10:44:01 | 25 | think -- and, of course, you've received Mr. Leo's written |

10:44:04  1   victim impact statement, which in and of itself was very

10:44:06  2   compelling and showed the significant damage that this

10:44:10  3   defendant has done.  But I think the one thing I'd like to

10:44:13  4   point out is, all this talk about Mr. Shickles is just

10:44:18  5   simply all about him.  He is -- there's been nothing about

10:44:23  6   the victims here from him.  There's been nothing about

10:44:27  7   making things right with the victims, making the victims

10:44:30  8   whole.

10:44:31  9        He's got these extremely large settlements that

10:44:34  10  he is supposed to be paying, yet, he's living in a house

10:44:38  11  where he's paying $42,000 a year in rent.  He recently got

10:44:42  12  a new car as laid out in the PSR.  He has stopped making

10:44:47  13  payments on his settlement.  He has no intent from his

10:44:51  14  actions, anyway, of making any provision for the victims

10:44:56  15  in this case.  And everything that you've heard from the

10:44:58  16  defense side has just been all about him.

10:45:00  17        Even his written statement to you, Judge, was

10:45:04  18  unapologetic.  He regretted getting caught.  He regretted

10:45:08  19  the fact that this is going to affect his family, but

10:45:11  20  there was nothing in there about the victims.  So I'm very

10:45:14  21  glad to see Mr. Leo and Mr. Barnes, who traveled here from

10:45:17  22  Huntsville.  This was that important to them that they be

10:45:20  23  here to see this, that they were able to tell you first

10:45:24  24  person exactly who Mr. Shickles is and what his crimes

10:45:28  25  have done to them and to Simple Helix.

| | | |
|---|---|---|
| 10:45:31 | 1 | You know, again, it's kind of once a fraudster, |
| 10:45:39 | 2 | always a fraudster.  He got appointed counsel because -- I |
| 10:45:43 | 3 | think.  I don't know because we're not part of that but -- |
| 10:45:47 | 4 | and this is nothing, of course, against Mr. Aldredge. |
| 10:45:49 | 5 | It's always a pleasure to deal with Mr. Aldredge.  But I |
| 10:45:52 | 6 | think that Mr. Shickles wants to use the bankruptcy when |
| 10:45:57 | 7 | it favors him, but he doesn't want to pay on it when it's |
| 10:46:00 | 8 | going to potentially involve some financial sacrifice on |
| 10:46:03 | 9 | his part. |
| 10:46:04 | 10 | And so, it's just a shame that the taxpayers have |
| 10:46:09 | 11 | footed the bill for this and I don't believe that it was |
| 10:46:11 | 12 | this court's fault.  I think that happened back in |
| 10:46:14 | 13 | Alabama.  But I mention that again just simply as part of |
| 10:46:17 | 14 | the -- this trend that we're seeing with Mr. Shickles of |
| 10:46:22 | 15 | just simply just taking, taking, taking.  He's sorry he |
| 10:46:27 | 16 | got caught, he's sorry this is going to have a bad effect |
| 10:46:30 | 17 | on his family, but he doesn't seem the least bit sorry for |
| 10:46:33 | 18 | Mr. Leo or for the other employees of Simple Helix who |
| 10:46:37 | 19 | this has drastically affected, as well. |
| 10:46:39 | 20 | So we would ask that the Court follow our |
| 10:46:42 | 21 | recommendation of the government in the plea agreement. |
| 10:46:44 | 22 | We would certainly ask the Court and urge you not to go |
| 10:46:47 | 23 | any less than that, by any means.  I don't think this |
| 10:46:51 | 24 | defendant is deserving of that.  And I believe that the |
| 10:46:55 | 25 | facts and circumstances here warrant the recommendation |

10:46:58  1  that's in the plea agreement.  And that, also, Judge, I
10:47:01  2  believe that there's also a provision for a fine in the
10:47:02  3  plea agreement, too, which we would ask for, but of
10:47:06  4  course, restitution will take precedence over all that.
10:47:08  5  Thank you.
10:47:08  6          THE COURT:  All right.
10:47:17  7          MR. ALDREDGE:  Your Honor, if I may.
10:47:18  8          THE COURT:  Sure.
10:47:19  9          MR. ALDREDGE:  I've got copy of his statement
10:47:21  10 here.  He mentioned the victim four or five times.  So I'm
10:47:25  11 not sure what Mr. Devlin's referring to in his ringing
10:47:30  12 endorsement of the plea agreement.  And I would also say
10:47:33  13 that prior to his wife having a stroke, he did contribute
10:47:39  14 50, $60,000 towards his restitution debt and they have
10:47:43  15 stopped since the additional familial burdens of a year
10:47:51  16 ago.  That's all I have.
10:47:52  17         THE COURT:  Thank you very much.
10:47:56  18         Mr. Shickles, let me start off by making an
10:48:01  19 observation that I frequently make in these sorts of cases
10:48:03  20 and that is in many, if not most, cases that I preside
10:48:09  21 over at sentencing, I'm able to look at the background of
10:48:13  22 folks and typically there is a direct line between severe
10:48:21  23 disadvantage, childhood trauma, substance abuse disorders,
10:48:28  24 people who you could tell from the beginning, they were
10:48:32  25 destined for trouble; and then, these cases stand out

10:48:40    1   because they're people who have been given every

10:48:43    2   advantage, every opportunity, every privilege in our

10:48:45    3   society, and rather than being grateful and productive,

10:48:50    4   law-abiding citizens, they turn, because of their greed,

10:48:56    5   and victimize other people.

10:48:58    6            And I often wonder whether it's that simply you

10:49:02    7   have a remarkable ability to sort of live two lives or to

10:49:06    8   deceive yourself, but that's not my business.  And much of

10:49:10    9   what people have talked about today that in the letters

10:49:12   10   that I've read on your behalf are people who talk about

10:49:15   11   what a good man you are, and it's not my domain or

10:49:19   12   province to decide whether you're a good man or not.

10:49:22   13   That's for everyone to decide based on the evidence that

10:49:25   14   they choose to look at.

10:49:27   15            My job is to look at what you've done and to

10:49:33   16   deliver consequences not only for you but for other people

10:49:35   17   who are similarly situated so that they know that once

10:49:39   18   they start down the path that you were on for years of

10:49:43   19   daily manipulation and lying for just sheer greed, that

10:49:48   20   there's a cost to it.  And I'm a firm believer, though, as

10:49:53   21   opposed to other kinds of criminality where sometimes

10:49:56   22   punishment makes a difference and sometimes punishment

10:49:59   23   doesn't.

10:50:00   24            In this kind of case, punishment does make a

10:50:03   25   difference because people like you who were out there who

10:50:06  1  were in a position to effect these harms on innocent,
10:50:10  2  hard-working people, they sit up and watch when I sentence
10:50:13  3  people and that's what I'm doing today.  I'm delivering a
10:50:17  4  harsh consequence to you because you deserve it.  You've
10:50:22  5  been given every advantage, every privilege.
10:50:24  6        And I hope that everyone who speaks on your
10:50:28  7  behalf or sees the other side that you want them to see
10:50:31  8  that they take time if they're honest with themselves and
10:50:34  9  with you, that they take time to look at the victim impact
10:50:37  10  statements in these cases because these aren't some
10:50:40  11  anonymous, invisible, imaginary people.  These are people
10:50:44  12  who work hard, who have to get out -- come in and out of
10:50:50  13  retirement when they thought they had worked hard all
10:50:52  14  their lives and they finally reach the point where they
10:50:54  15  can enjoy the fruits of their labor, they find that they
10:50:57  16  have little or nothing because you were buying expensive
10:51:00  17  cars and living the life that you wanted -- lying to them
10:51:04  18  all along.  That's why you're here today and that's why
10:51:06  19  you're going to get a serious punishment.  You deserve it.
10:51:11  20        In this case, the victim even noted this that you
10:51:16  21  make more money than I do today standing here and you've
10:51:20  22  got a court-appointed lawyer.  You haven't made a penny
10:51:24  23  payment on your obligation that you've signed -- you've
10:51:28  24  signed an obligation for millions of dollars not just what
10:51:30  25  you're here for.  You haven't made a penny payment in the

| | | |
|---|---|---|
| 10:51:33 | 1 | last year.  That's what speaks more loudly to me than |
| 10:51:39 | 2 | anything.  So I think you know where this is going. |
| 10:51:44 | 3 | I sentence you within the guidelines, although I |
| 10:51:47 | 4 | think I could easily justify a sentence above the |
| 10:51:50 | 5 | guidelines.  But having considered all of the elements |
| 10:51:51 | 6 | that I'm required to consider, I sentence you to a term of |
| 10:51:54 | 7 | incarceration in the Bureau of Prisons of 63 months, |
| 10:51:58 | 8 | followed by a term of supervised release of three years, a |
| 10:52:01 | 9 | fine of $100,000, in addition to restitution in the amount |
| 10:52:04 | 10 | of $1,657,639.93, a special assessment of $100 under the |
| 10:52:14 | 11 | Victims of Crimes Act. |
| 10:52:16 | 12 | While you're on supervised release, you're going |
| 10:52:17 | 13 | to have to comply with a number of provisions and |
| 10:52:22 | 14 | conditions.  One is that while you're on release, you are |
| 10:52:25 | 15 | not to commit any other federal, state, or local crimes |
| 10:52:27 | 16 | and you comply with the mandatory and standard conditions |
| 10:52:30 | 17 | adopted by this court.  That you not use -- excuse me, |
| 10:52:34 | 18 | that you provide the probation officer with access to any |
| 10:52:38 | 19 | financial information and authorize the release of |
| 10:52:41 | 20 | financial information. |
| 10:52:42 | 21 | That you not incur any new credit charges or open |
| 10:52:46 | 22 | additional lines of credit without the approval of your |
| 10:52:49 | 23 | probation officer.  I'm going to order that you pay any |
| 10:52:54 | 24 | financial penalty, including fine and restitution, in |
| 10:52:58 | 25 | accordance with the schedule of payments.  You're to |

10:53:04  1  notify the Court of any changes or circumstances that

10:53:05  2  might affect your ability to pay the penalty.  That you

10:53:08  3  not work in any type of employment without the prior

10:53:11  4  approval of your probation officer.

10:53:13  5      That you make restitution to Simple Helix, LLC in

10:53:16  6  the amount previously stated and that if you're not able

10:53:20  7  to pay this indebtedness currently, you cooperate with the

10:53:23  8  U.S. Attorney's Office, Bureau of Prisons, and the

10:53:26  9  Probation Office to make payment as soon as possible,

10:53:29  10  including during any period of incarceration.  That any

10:53:32  11  unpaid balance will be paid on a schedule of monthly

10:53:35  12  installments to be established by the probation office.

10:53:38  13      I find that you don't have the ability to pay

10:53:42  14  interest, so I will waive the interest requirement in this

10:53:45  15  case.  I to have to impose the $100 mandatory special

10:53:47  16  assessment.  Unless you've waived your right in your plea

10:53:50  17  agreement, you have the right to appeal the sentence I've

10:53:52  18  given you today, and if you want to do that and have the

10:53:54  19  ability to do it, you can talk to Mr. Aldredge about how

10:53:57  20  to do that and the time limits for doing it.

10:54:00  21      Mr. Devlin, what's the government's position with

10:54:03  22  regard to allowing Mr. Shickles to remain out on bond?

10:54:06  23      MR. DEVLIN:  Judge, we have not been made aware

10:54:07  24  of anything other than compliance from Pretrial Services

10:54:10  25  at this point.

| | | |
|---|---|---|
| 10:54:11 | 1 | THE COURT:  Mr. Shickles, if you will tell me |
| 10:54:12 | 2 | that you'll continue to comply with the conditions that |
| 10:54:15 | 3 | you've been under up to this point and that you appear |
| 10:54:18 | 4 | when and where as designated for the service of your |
| 10:54:21 | 5 | sentence, I'll let you remain on bond.  Will you do that? |
| 10:54:23 | 6 | THE DEFENDANT:  I will, your Honor. |
| 10:54:24 | 7 | THE COURT:  Okay.  Very good.  Mr. Aldredge, |
| 10:54:26 | 8 | anything else? |
| 10:54:26 | 9 | MR. ALDREDGE:  Yes, your Honor.  We'd ask the |
| 10:54:27 | 10 | Court for two recommendations with respect to service of |
| 10:54:31 | 11 | the sentence.  First, that he be placed at FPC Montgomery |
| 10:54:40 | 12 | and, secondly, that the Court recommend his participation |
| 10:54:43 | 13 | in RDAP program. |
| 10:54:45 | 14 | THE COURT:  Is there reflection in the record |
| 10:54:47 | 15 | that would justify that? |
| 10:54:49 | 16 | MR. ALDREDGE:  Yes. |
| 10:54:49 | 17 | THE COURT:  Okay.  Very good.  Any objection from |
| 10:54:51 | 18 | the government? |
| 10:54:52 | 19 | MR. DEVLIN:  No objection to those |
| 10:54:54 | 20 | recommendations, Judge. |
| 10:54:54 | 21 | THE COURT:  I'll make those recommendations in my |
| 10:54:56 | 22 | judgment. |
| 10:54:56 | 23 | MR. ALDREDGE:  Thank you, Judge.  Nothing |
| 10:54:59 | 24 | further. |
| 10:54:59 | 25 | MR. DEVLIN:  Nothing further, Judge. |

1          (Proceedings concluded.)

2                    *  *  *  *  *  *

3

4   UNITED STATES DISTRICT COURT  )

5   WESTERN DISTRICT OF TEXAS      )

6

7      I, LILY I. REZNIK, Certified Realtime Reporter,

8   Registered Merit Reporter, in my capacity as Official

9   Court Reporter of the United States District Court,

10  Western District of Texas, do certify that the foregoing

11  is a correct transcript from the record of proceedings in

12  the above-entitled matter.

13     I certify that the transcript fees and format comply

14  with those prescribed by the Court and Judicial Conference

15  of the United States.

16     WITNESS MY OFFICIAL HAND this the 19th day of August,

17  2023.

18                        *Lily Iva Reznik*

19                        ~~~~~~~~~~~~~~~~~~~~~~~~
                          *LILY I. REZNIK, CRR, RMR*
20                        *Official Court Reporter*
                          *United States District Court*
21                        *Austin Division*
                          *501 West 5th Street,*
22                        *Suite 4153*
                          *Austin, Texas 78701*
23                        *(512)391-8792*
                          *SOT Certification No. 4481*
24                        *Expires:  1-31-25*

25